UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

MEARS GROUP, INC.,

                              Plaintiff,

        v.                                    Action No. 3:08–CV–329

L.A. PIPELINE CONSTRUCTION CO.,
INC.,

                              Defendant.

<u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court on cross Motions for Summary Judgment and a Motion to Compel.  Plaintiff, Mears Group Inc. ("Mears"), filed its Motion (Docket No. 59) on November 10, 2008.  Defendant, L.A. Pipeline Construction Company, Inc. ("L.A. Pipeline"), filed its Motion (Docket No. 68) on November 28, 2008.  Plaintiff filed its Motion to Compel (Docket No. 75) on December 10, 2008.

For the reasons that follow, the Court will GRANT Mears's Motion for Summary Judgment as to liability; will DENY L.A. Pipeline's Motion for Summary Judgment in its entirety; GRANTED Mears's Motion to Compel, only to the extent allowing the Court's <u>in camera</u> review of the document in question; and will DENY the Motion to Compel as to Mears's request to inspect and copy the Agreement.

I.  <u>BACKGROUND</u>

A.  <u>Factual Background</u>

This dispute arises out of a subcontract to provide horizontal directional drilling

1

("HDD") near Stanardsville in Greene County, Virginia (the "Work"). The Work represented a half-mile portion of a larger project by Columbia Gas Transmission Corporation ("Columbia") to construct approximately thirty-three miles of natural gas pipeline throughout the Commonwealth of Virginia (the "Pipeline Project"). (Pl.'s Undisputed Material Facts ¶ 2.) After L.A. Pipeline submitted a bid, Columbia selected it to be general contractor on the Pipeline Project, which had a total price of $20 million. (Id. at ¶¶ 2-3.)

The Work required HDD below a flowing creek known as Swift Run. L.A. Pipeline sought, and Mears provided, a quote to complete the Work outlining its proposed terms. (Compl. ¶ 10.) Prior to submitting its proposal, Mears received the bid set documents and a copy of a report of ground core samples ("GCS Report") provided by Columbia. (Pl.'s Undisputed Material Facts ¶¶ 6-7.) Nothing in the documents or report indicated "any underground aquifer or underground water" at the site of the Work. (Id. at 8.) Mears utilized this information to formulate its proposal and did not anticipate that it would encounter any conditions other than those identified in the GCS Report.

L.A. Pipeline accepted Mears's proposal and entered into a subcontract (the "Subcontract") with Mears on July 20, 2007 (Pl.'s Undisputed Material Facts, Ex. C.) agreeing to pay Mears according to the terms contained therein.[1] (Compl. ¶ 10.) The parties agreed in the Subcontract to the following: (1) L.A. Pipeline would pay Mears

---

[1] Mears sent L.A. Pipeline a copy of the Subcontract on May 1, 2007. L.A. Pipeline president Richard West signed the Subcontract on July 20, 2007. (Pl.'s Mem. Supp. Pl.'s Mot. Summ. J. 3-4; see also Subcontract 7.) L.A. Pipeline returned the Subcontract to Mears on August 2, 2007. (Pl.'s Mem. Supp. Pl.'s Mot. Summ. J. 4.)

(a) $960 per foot, (b) $1800 per hour per drill spread for extra work performed by Mears with its own equipment and personnel, and (c) 115% of the cost of rental equipment, materials, and subcontractors; and (2) if ground conditions resulted in the abandonment of the Work, Mears would be entitled to reimbursement for all work performed prior to abandonment, including all costs related to mobilization and demobilization.  (Compl. ¶ 10; see also Subcontract ¶¶ 4, 6(p).[2])  The Subcontract also limited Mears's duties to L.A. Pipeline and Columbia and expressly stated that Mears bore no responsibility for any errors in plans and specifications for the drill path.  (Subcontract ¶ 6(c).[3])  Although Mears limited its liability for "any problems, delays, lost cost, or expense caused by errors or defects in any part of the overall project design or the design and/or specifications" (id.), the Subcontract also states that "[t]he profile geometry would need to be reviewed prior to the commencement of work" and the "[d]esign radius, entry/exit angles, and depth of cover must meet Mears' requirements " (id. at ¶ 6(o)).

Prior to commencing the Work, Columbia provided the alignment of the drill path as well as the entry and exit locations for the Work.  Apparently, a Mears representative raised

---

[2] In relevant part, Paragraph 6(p) of the Subcontract states:  "Should ground conditions be encountered that result in the abandonment of the work, Mears will be entitled to reimbursement for all work undertaken prior to abandonment (including all costs related to the mobilization and demobilization of plant, equipment, and personnel to and from the site)."

[3] Paragraph 6(c) states: "Contractor/Owner understands that Mears and its personnel are not pipeline design engineers and have not designed the work to be performed nor made any determination of its suitability for the purpose sought to be achieved by Contractor/Owner.  Therefore, Mears shall not be responsible for any problems, delays, lost cost, or expense caused by errors or defects in any part of the overall project design or the design and/or specifications applicable to Mears' work."

3

concerns about the drill path.  The parties somewhat paradoxically dispute the result of Mears raising this concern.  Richard Neil Smith, a Mears representative, claims that the entry point was moved (see Smith Dep. 17:4-18, Oct. 23, 2008 (stating the entry point was "moved back some distance and to the right some distance" because "[y]ou can't drill a bend like that using [HDD]")), while Jeffory Waggoner, a L.A. Pipeline representative, claims the entry point was not moved (see Waggoner Dep. 69:12-23,[4] Oct. 23, 2008 (stating Columbia refused to move the location of the entrance of the drill because "it wanted to keep the line as short as possible")).  Columbia specified a minimum depth below Swift Run creek at three to four feet in accordance with industry practice and Virginia Department of Transportation requirements. (See Pl.'s Mem. Supp. Pl.'s Mot. Summ. J. 6 (citing Ruhlin Dep. 12:7-21, Oct. 23, 2008).)

Whether or not the entry point was moved, Mears apparently became comfortable enough with the entry point to begin HDD.  Mears began the HDD boring process at the Work site on August 6, 2007, four days after receiving the signed Subcontract from L.A. Pipeline, and completed the first major step in the HDD process—the pilot hole—by the afternoon of September 7, 2007. (Id. (citing Smith Aff. ¶ 23, Nov. 7, 2008).)  However, on September 10, 2007, the Work site unexpectedly flooded from the HDD pilot hole to the exit point (the "September Flooding").  The water flowed at a rate between 75 and 100 gallons per minute.  (Id. (citing Smith Aff. ¶ 25).)  Mears, L.A. Pipeline, and Columbia met on site on September 12, 2007 to discuss the flooding.  No single cause of the September

---

[4] Because the parties failed to correctly cite the depositions on which they relied to include the line numbers, the Court has identified the line numbers to which the parties likely referred.

4

Flooding, above ground or subsurface, could be identified.  (Def.'s Resp. Opp. Pl.'s Mot. Summ. J. 2-3 (<u>citing</u> Waggoner Dep. 52:4-55:23; Smith Dep. 52:23-53:16).)  However, the parties agreed that Mears would collect, contain, and haul the water to a dumping facility. (Pl.'s Mem. Supp. Pl.'s Mot. Summ. J. 6 (<u>citing</u> Smith Aff. ¶¶ 26-27).)  At L.A. Pipeline's suggestion, Columbia and Mears entered into a separate agreement to compensate Mears for collecting, containing, and hauling the flood water (the "Columbia-Mears Agreement").[5] (<u>Id.</u> at 6, 6 n.4 (<u>citing</u> Smith Aff. ¶ 28; Waggoner Dep. 73:20-74:16; West Dep. 43:12-25, Oct. 22, 2008).)

On September 13, 2007, a Mears representative faxed a letter to L.A. Pipeline detailing the water flow as a result of the September Flooding and memorializing the decision of the parties at the September 12, 2007 meeting (the "September Letter").  (<u>See</u> Pl.'s Undisputed Material Facts, Ex. D.)  The September Letter also stated that any work Mears completed related to the September Flooding lay outside the scope of the Work identified in the Subcontract and that all non-productive time due to the flooding would be charged at a rate of $1400 per hour per drill spread, plus rental equipment, material and subcontractors at 115%.  (September Letter 2 (<u>citing</u> Subcontract ¶ 5).)  In the September Letter, Mears also wrote that "[a]ny work that is ultimately abandoned due to these conditions will be charged as extra work."[6]  (<u>Id.</u>)

---

[5] Mears eventually billed, and received compensation from, Columbia for the collecting, containing, and hauling, as required by the Columbia-Mears Agreement.  (Def.'s Resp. Opp. Pl.'s Mot. Summ. J. 3.)

[6] L.A. Pipeline states that it did not receive the September Letter until "sometime well after the date of the letter" and "maintains that the letter only 'clarified' the Subcontract," making it "irrelevant for summary judgment purposes."  (Def.'s Resp. Opp. Pl.'s Mot. Summ. J. 3.)

Apparently, L.A. Pipeline and Columbia initially determined that Mears should recommence HDD, the flooding notwithstanding.  However, Mears's efforts continued to face ground conditions that impeded HDD and made the Work more costly.  Despite these challenges, Mears completed the horizontal directional bore to approximately 97% of the total volume required before the 2007 Thanksgiving holiday on November 22, 2007.  (Pl.'s Mem. Supp. Pl.'s Mot. Summ. J. 8.)  Mears prepared to begin pipe installation, but when workers returned to the work site after the holiday, they discovered that the stream bed had collapsed over a portion of the bore and water flowed from the exit hole.  (Id.)

On November 28, 2007, Columbia instructed Mears, through L.A. Pipeline, to abandon the Work and to identify options for plugging the ends of the drilled hole.  (Id. (citing Smith Aff. ¶ 37).)  Among other things, Columbia apparently believed that "[Mears] could not get through" utilizing HDD.  (Id. (citing West Dep. 38:8-39:1).)  Columbia also considered "environmental fines, cost concerns and concerns voiced by Mears" before abandoning the Work.  (Def.'s Resp. Opp. Pl.'s Mot. Summ. J. 4 (citing Ruhlin Dep. 28:4-31:24).)  Mears confirmed Columbia's instructions the next day and complied with directions to grout and plug the crossing.  Mears's last day on its portion of the Pipeline Project was December 8, 2007.[7]  (Pl.'s Mem. Supp. Pl.'s Mot. Summ. J. 8 (citing Smith Aff. ¶ 40).)

On December 21, 2007, Mears sent to L.A. Pipeline an invoice for its efforts on the Work performed between August 6, 2007 and December 8, 2007—over four

---

[7] Subsequently, Columbia paid L.A. Pipeline $500,000 to complete this 2700 foot portion of the Pipeline Project utilizing the conventional "open-cut" method.  (Pl.'s Mem. Supp. Pl.'s Mot. Summ. J. 9.)

months—totaling $2,512,933.32.  (See Pl.'s Undisputed Material Facts, Ex. E.)  The invoice

excluded any charges for the costs of collecting, containing, and hauling water due to the

September Flooding because the Columbia-Mears Agreement obligated Columbia to pay

Mears for these efforts.  L.A. Pipeline has refused to send any payment for the charges

appearing on the invoice.

## B.  Procedural Background

On May 29, 2008, Mears filed its Complaint against L.A. Pipeline (Docket No. 1)

alleging L.A. Pipeline:  (1) breached the Subcontract by refusing to pay Mears,[8] (2)

breached warranties it expressly or impliedly represented based on its delivery of the

Subcontract's underlying construction documents,[9] and (3) is estopped from refusing

payment to Mears based on L.A. Pipeline's promises, representations, and warranties

regarding Mears's work for L.A. Pipeline.[10]  In addition to filing an Answer and

---

[8] According to Mears, breach has occurred based on L.A. Pipeline's refusal to honor the following express or implied agreements:  "(a) to pay Mears in accordance to the Subcontract; (b) to grant Mears equitable adjustments to the Subcontract time and price for differing ground conditions; (c) to furnish Mears with a dry work area; (d) to fairly and reasonably administer the Subcontract; (e) to deal with Mears in good faith; and (f) to grant Mears access to the [Pipeline] Project [to the extent] reasonably necessary to complete the Work in accordance with the Project schedule and usual and customary construction methods, techniques and sequences."  (Compl. ¶ 19.)

[9] The alleged warranties are:  "(a) the construction documents were fit and suitable for their intended purposes; (b) the information and representations contained in the Subcontract documents . . . were complete and accurate; and (c) the Work could be performed using ordinary, economically practicable and customary construction means, methods and techniques within the time allocated in the Subcontract documents."  (Id. ¶ 20.)

[10] Mears is a Delaware corporation with its principal place of business in Michigan.  L.A. Pipeline is an Ohio corporation with its principal place of business in Ohio and a registered office in Glen Allen, Virginia.  Thus, Mears and L.A. Pipeline have diverse citizenship, and Mears, claiming damages in excess of $75,000, may invoke diversity jurisdiction against

Counterclaim against Mears, L.A. Pipeline filed a Third Party Complaint—which it

subsequently amended—against Columbia, alleging implied indemnification and

negligence.  Columbia and L.A. Pipeline subsequently resolved the Amended Third Party

Complaint out of court.  That settlement agreement is the subject of Mears's Motion to

Compel.


## II.  MOTIONS FOR SUMMARY JUDGMENT

### A.  Legal Standard

A motion for summary judgment lies only where "there is no genuine issue as to any

material fact" and where "the moving party is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The

Court must view the facts and the inferences drawn therefrom in the light most favorable to

the non-moving party.  Ballinger v. N.C. Agric. Extension Serv., 815 F.2d 1001, 1004 (4th

Cir. 1987).  While viewing the facts in such a manner, courts look to the affidavits or other

specific facts to determine whether a triable issue exists.  Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 248 (1986).  Summary judgment is not appropriate if "the evidence is such

that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.  To

overcome a motion for summary judgment, the non-moving party must establish that a

genuine issue of material fact actually exists.  Fed. R. Civ. P. 56(e); see also Matsushita Elec.

Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-86, 586 n.11 (1986).  "Mere

---

L.A. Pipeline for these claims based upon 28 U.S.C. § 1332.  (See id. at ¶¶ 31-32 (claiming
damages totaling $2,512,933.32, plus prejudgment interest).)

unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law." Emmett v. Johnson, 532 F.3d 291, 297 (4th Cir. 2008). "Where no genuine issue of material fact exists," it is the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." Drewitt v. Pratt, 999 F.2d 774, 778–79 (4th Cir. 1993) (internal quotation marks omitted).

B.  Discussion

1.  Subcontract's Interpretation a Question of Law Allowing for Summary Judgment

Since the parties largely agree on the material facts underlying this case, and concur that the unambiguous Subcontract governs, the disposition of this matter turns on the Court's interpretation of that agreement. "When a contract is clear and unambiguous, it is the court's duty to interpret the contract[] as written." Palmer & Palmer Co., LLC v. Waterfront Marine Constr., Inc., 662 S.E.2d 77, 80 (Va. 2008) (citing Winn v. Aleda Constr. Co., 315 S.E.2d 193, 194 (Va. 1984)). "Interpretation of a contract is a question of law. . . ." Id. (citing PMA Capital Ins. Co. v. U.S. Airways, Inc., 626 S.E.2d 369, 372 (Va. 2006)). "[T]he parties' contract becomes the law governing the case unless it is repugnant to some rule of law or public policy." Id. (citing Winn, 315 S.E.2d at 194). Thus, where the undisputed material facts demonstrate one party has breached the Subcontract, and the other party is due judgment as a matter of law, summary judgment is appropriate.

2.  The Subcontract Has Been Breached and Entitles Mears to Reimbursement

a.  "Subsurface Conditions" Versus "Ground Conditions"

Paragraph 6(p) provides the language on which both parties rely for their positions.

In its entirety, the provision states:

> [1.]  No geotechnical data has been provided. [2.]  This proposal is based on
> the assumption that the <u>subsurface conditions</u> that will be encountered by the
> HDD installation(s) will consist of soft soils or rock with an unconfined
> compressive strength of less than 10,000 PSI. [3.]  No gravel, cobbles, or
> boulders will be encountered. [4.]  In the event that other differing <u>ground
> conditions</u> are identified or encountered, an equitable increase in the contract
> price and/or contract time will be mutually agreed. [5.]  Should <u>ground
> conditions</u> be encountered that result in the abandonment of the work, Mears
> will be entitled to reimbursement for all work undertaken prior to
> abandonment (including all costs related to mobilization and demobilization
> of plant, equipment, and personnel to and from the site). [6.]  In the event
> that the work is abandoned, Mears will not be liable for any damages or
> penalties, nor be required to contribute to the performance of the work by an
> alternative method, or be liable for any period of maintenance.

(Subcontract ¶ 6(p) (emphasis added).)

L.A. Pipeline argues that this portion of the Subcontract blocks Mears's recovery
because the provision limits Mears's compensation to instances "when the work is
abandoned due to *subsurface conditions* different from those that were originally
contemplated by the parties" and "Mears presented no evidence . . . from which the Court
can conclude that the conditions of this unambiguous Subcontract are met by the facts of
this case."  (Def.'s Resp. Opp. Pl.'s Mot. Summ. J. 9-10 (emphasis in the original).)  L.A.
Pipeline proffers the deposition testimony from Richard Neil Smith, a Mears representative,
to suggest Mears intended the term "ground conditions" to be synonymous with
"subsurface conditions" as used in Paragraph 6(p) of the Subcontract.  (<u>See</u> Smith Dep.
45:9-24.)

L.A. Pipeline proffers Smith's deposition testimony ostensibly to demonstrate
Mears's intent as drafter of the Subcontract.  However, "[t]he guiding light in the

10

construction of a contract is the intention of the parties as expressed by them in the words they have used," so the Court is "bound to say that the parties intended what the written instrument plainly declares." Palmer & Palmer, 662 S.E.2d at 80. (citing W.F. Magann Corp. v. Va.-Carolina Elec. Works, Inc., 123 S.E.2d 377, 381 (Va. 1962)). Thus, to interpret the Subcontract, the Court need not inquire as to either party's subjective intent but rather must read the Subcontract objectively looking at the document's meaning as clear on its face. Smith's statement that Mears intended no difference between "subsurface conditions" and "ground conditions" does not settle the issue; the question is what a reasonable person in the position of the parties would read the words to mean.[11]

Mears argues that "ground conditions" should not be equated with "subsurface conditions." According to Plaintiff, the two terms as used in this provision plainly serve different purposes because each sentence serves a different purpose. (See Pl.'s Reply Supp. Pl.'s Mot. Summ. J. 4.) Since the Subcontract does not define the term "ground conditions," the argument continues, the Court should interpret "ground" based on its "usual, ordinary, and popular meaning," Palmer & Palmer, 662 S.E.2d at 77, which includes "earth or soil and the bottom of a body of water," and "is intended to be a broad term. . . often used in court opinions as a general description, which includes surface conditions, subsurface conditions, and ground water conditions among others." (Pl.'s Reply Supp. Pl.'s Mot. Summ. J. 5-6 (citing The Random House College Dictionary 583 (Rev. ed. 1984); Merriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/

---

[11] Even if the Court were to consider Mears's subjective intent, Smith's statement does not support in full L.A. Pipeline's contention that "ground conditions" means "unexpected subsurface conditions" as used in the fifth sentence.

ground; <u>Loftis v. United States</u>, 76 F. Supp. 816, 819 (Ct. Cl. 1948); <u>Ceccanti, Inc. v.</u>

<u>United States</u>, 6 Cl. Ct. 526, 529 (Cl. Ct. 1984)).)  Finally, Mears argues that if the parties

intended to use the narrower term "subsurface" in the Work Abandonment Clause, they

would have done so.  (Pl.'s Reply Supp. Pl.'s Mot. Summ. J. 6.)

  Mears's argument strains an objectively reasonable reading of Paragraph 6(p).  It is

true that the sentences in Paragraph 6(p) serve unique purposes, and the Court should read

the contract such that meaning is given to each of them.  <u>See</u> <u>Ames v. Am. Nat'l Bank of</u>

<u>Portsmouth</u>, 176 S.E. 204, 217 (Va. 1934) ("The presumption always is that the parties

have not used words aimlessly and that no provision is merely a superfluity unless it is

plainly merely a repetition.").  However, it does not necessarily follow that a reasonable

reading of Paragraph 6(p)'s six unique sentences precludes equating "subsurface

conditions" with "ground conditions."  Reading the paragraph as a whole, considering the

separate purposes of each sentence, suggests:  (1) that the parties assumed certain

subsurface conditions existed absent specific geotechnical data (sentences one, two, and

three);[12] (2) if these assumptions turned out to be incorrect, the parties would renegotiate

the price for the Work, the time allotted for the Work, or both (sentence four); (3) if the

Work could not be completed because some "ground" or, specifically, "subsurface"

condition prevented the Work's completion, Mears would be compensated for its efforts

prior to the decision to abandon the Work (sentence five) (the "Work Abandonment

---

[12] This has been disputed. (<u>See</u> Def.'s Mem. Supp. Def.'s Mot. Summ. J. 5 n.8 (<u>citing</u> Smith Dep. 42:18-44:18 and stating "[g]eotechnical date [sic] was provided, along with an actual soil sample that Mears had analyzed at an independent lab").)  However, Smith also states, "[Geotechnical] data, strictly, would be the test results themselves." (Smith Dep. 43:7-8.)

Clause"); and (4) Mears would bear no responsibilities related to completing the Work by a means other than HDD (sentence six). Indeed, if the parties did not intend the terms "subsurface conditions" and "ground conditions" to be interchangeable, the fourth sentence of Paragraph 6(p) would be nonsensical. The "ground conditions" in the fourth sentence, modified by "other differing," obviously refers back to the initial assumptions espoused regarding the "subsurface conditions."

Thus, an objectively reasonable reading of Paragraph 6(p) suggests the parties intended to use "subsurface conditions" and "ground conditions" interchangeably.[13]

b.    The River Bed Collapse Is a "Subsurface Condition"

The pertinent question now arises whether the undisputed material facts before the Court trigger the Work Abandonment Clause and entitle Mears to payment under its terms. The result turns on the specificity of evidence required to prove subsurface conditions caused abandonment of the Work.

L.A. Pipeline argues that summary judgment in Mears's favor would be inappropriate because Mears has "presented no evidence, either through direct deposition testimony or expert opinion . . . . as to the exact cause of the stream collapse that ultimately lead [sic], along with Mears' own recommendation[,] to the abandonment of the HDD." (Def.'s Resp. Opp. Pl.'s Mot. Summ. J. 9-10.) L.A. Pipeline basically argues that myriad

---

[13] This interpretation stops short of L.A. Pipeline's argument that the parties actually meant "differing subsurface conditions" when they used the term "ground conditions" in Paragraph 6(p). (See Def.'s Resp. Opp. Pl.'s Mot. Summ. J. 9-10; see also Def.'s Mem. Supp. Def.'s Mot. Summ. J. 10-11.) That interpretation also stretches reasonableness. Moreover, it is clear that the parties could have but chose not to use the modifiers "other differing" in the Work Abandonment Clause.

putative causes exist for the stream bed's collapse, so the Work Abandonment Clause does

not apply.  (Id. at 10 ("Clearly, the stream bed could have collapsed for any number or [sic]

reason, including that the drill path destroyed its foundation by being too close.").)  In

addition, L.A. Pipeline suggests that because other factors, such as environmental fines, cost

concerns, and Mears's advice, contributed to Columbia's decision to halt HDD, the Work

Abandonment Clause does not apply.  (See Def.'s Resp. Opp. Pl.'s Mot. Summ. J. 4.)

L.A. Pipeline's arguments are misguided.  First, L.A. Pipeline attempts to transform

the evidentiary question from the cause of abandonment to the cause of the creek bed's

collapse.  Second, L.A. Pipeline attempts to add the requirement that subsurface conditions

provide the exclusive basis for abandoning HDD.  In essence, Defendant would have the

Court read the Work Abandonment Clause to state:  "Should ground conditions be

encountered that result in *a collapse of the River Swift creek bed*, Mears will be entitled to

reimbursement for all work undertaken prior to abandonment *as long as no other reasons*

*contributed to the decision to abandon HDD*."  (See Def.'s Mem. Supp. Def.'s Mot. Summ.

J. 8 ("As long as there is any explanation unrelated to ground conditions and Mears has no

evidence that ground conditions caused the collapse of the creek bed it cannot recover."),

11 ("[I]t *must be* subsurface conditions that caused the abandonment and Mears can

present no facts or qualified opinion to establish the cause of the November collapse.")

(emphasis in original).  Cf. Subcontract ¶ 6(p).)

However, this is not the language the parties utilized.  Accepting as the objectively

reasonable interpretation that "ground conditions" and "subsurface conditions" are

synonymous as used in the Paragraph 6(p), the Work Abandonment Clause does not

14

require proof of the exact "subsurface conditions" that caused the creek bed's collapse.  The Work Abandonment Clause states, "Should ground conditions be encountered that result in the abandonment of the work, Mears will be entitled to reimbursement for all work undertaken prior to abandonment (including all costs related to mobilization and demobilization of plant, equipment, and personnel to and from the site)."  (Subcontract ¶ 6(p).)  Mears need not prove that a subsurface condition caused the creek bed to collapse in order to trigger the Work Abandonment Clause.  Similarly, L.A. Pipeline's suggestion that Mears must prove that subsurface conditions provided the sole reason for the Work's abandonment strains an objective reading of Paragraph 6(p).  An objective reading of the clause does not suggest the parties intended that the clause not apply if factors in addition to ground conditions contributed to Columbia's decision to halt the Work.[14]

As required by the Work Abandonment Clause, Mears has demonstrated that ground or subsurface conditions resulted in abandonment of the Work.  The parties do not dispute that they abandoned the Work after the creek bed collapsed over the Thanksgiving weekend.  Moreover, as Mears argues, "[t]he collapse of the drill path concurrently with the collapse of the riverbed is a subsurface condition that was encountered and which resulted

_____

[14] Additionally, the Court considers the Subcontract as a whole when interpreting its parts. See Daughtry v. Diment, 385 S.E.2d 572, 575 (Va. 1989); Utica Mutual Ins. Co. v. Atl. Founds., Inc., No. 2:06cv487, 2007 WL 2318031 (E.D. Va. Aug. 8, 2007).  The overall tenor of the Subcontract limits Mears's responsibilities and liabilities.  (See, e.g. Subcontract ¶¶ 3(a) (limiting Mears's responsibility for damage to unmarked utility lines), 6(c) (limiting Mears's liability for any "problems, delays, lost cost, or expense" due to defective project designs or specifications), and 6(g) (limiting Mears's responsibility for damage to pipe coating due to the HDD installation process).)  Thus, it would be anomalous for Paragraph 6(p) to expand Mears's liability by restricting its ability to recover to situations in which ground conditions provide the exclusive basis for abandonment.

in the abandonment of the HDD."  (Pl.'s Resp. Opp. Def.'s Mot. Summ. J. 8.)  Significantly,

L.A. Pipeline admits that the collapse of the creek bed provided at least one reason why the

parties abandoned the project.  (See Def.'s Mem. Supp. Def.'s Mot. Summ. J. 4 ("Mears

continued to drill to approximately 97% completion before the creek bed of Swift Run

collapsed for unknown reasons, halting further drilling and, along with environmental fines,

cost concerns and concerns voiced by Mears, ultimately caused Columbia Gas to abandon

the [HDD]."); see also Waggoner Dep. 34:23-35:1 (describing the creek bed collapse as the

"final blow" to proceeding with HDD).)  Thus, there is no credible dispute over the material

fact that the collapse, a subsurface or ground condition, "result[ed] in abandonment of the

work," as required by the Work Abandonment Clause.  (Subcontract ¶ 6(p).)[15]

     c.    <u>Speculation about Mears's Negligence</u>

    L.A. Pipeline suggests that Mears somehow acted negligently with regard to the

Work.  However, as Mears points out, and the Court notes, "[m]ere unsupported

speculation is not sufficient to defeat a summary judgment motion if the undisputed

evidence indicates that the other party should win as a matter of law."  Emmett, 532 F.3d at

297.

---

[15] Mears also presents statements from Columbia in the form of deposition testimony from its representative, Richard M. West, that Columbia abandoned HDD because Mears "couldn't get through."  (Pl.'s Reply Supp. Pl.'s Mot. Summ. J. 7, 7 n.3 (referring to West's affirmation that "the gas company shut them down" because "they couldn't get through").)  L.A. Pipeline has objected to the use of this evidence since its attorney objected to the form of the question.  (Def.'s Counter Material Facts ¶ 2(l) ("[T]he series of questions and answers from which this quote is taken were all subject to form objections on the grounds that the questions either called for speculation, knowledge the witness could not know, were ambiguous or misstated facts.").)  However, the Court need not reach the admissibility of these statements in order to grant Mears summary judgment as to liability.

L.A. Pipeline suggests Mears's negligence primarily because Mears somehow bears responsibility for the drill path. (See, e.g. Def.'s Resp. Opp. Pl.'s Mot. Summ. J. 2 ("When drilling began Mears was comfortable that HDD could be satisfactorily completed.  Indeed paragraph 6(o) of the Subcontract provides that '[d]esign radius, entry/exit angles, and depths of cover must meet Mears' requirements.'  Mears cannot divest itself of responsibility for the drill path chosen.") (alteration in original), 10 ("Clearly, the stream bed could have collapsed for any number or [sic] reasons, including that the drill path destroyed its foundation by being too close."); see also Def.'s Mem. Supp. Def.'s Mot. Summ. J. 8 ("If the creek bed collapsed because of some aspect of the drill path or drilling technique . . . [the Work] was abandoned because the drill path or technique was defective and 'resulted' in the collapse of the creek bed. . . ."), 12 ("[T]he collapse of the creek bed was not a ground condition—it was the result of improper drilling by Mears.  The improper drilling resulted in the abandonment because it caused the collapse. . . ."); see also Def.'s Counter Material Facts ¶ 2(c) ("Mears expressly takes responsibility for the drill path. . . .").)[16]

This argument is unavailing.  There does exist some tension between Paragraphs 6(c) and 6(o) of the Subcontract.  Paragraph 6(c) states in its entirety:

> Contractor/Owner understands that Mears and its personnel are not pipeline design engineers and have not designed the work to be performed nor made any determination of its suitability for the purpose sought to be achieved by Contractor/Owner.  Therefore, Mears shall not be responsible for any problems, delays, lost cost, or expense caused by errors or defects in any part of the overall project design or the design and/or specifications applicable to

---

[16] L.A. Pipeline also implies Mears's negligence by referring to an occasion where a Mears worker fell asleep on the job.  (See Def.'s Counter Material Facts ¶ 2(m).)  However, this accusation has not formed a large part of the parties' arguments and does not, alone, demonstrate negligence on Mears's part.

17

Mears' work.

(Subcontract ¶ 6(c).)  On the other hand, Paragraph 6(o) states in its entirety:  "No plan & profile drawings have been provided with the RFQ.  The profile geometry would need to be reviewed prior to the commencement of work.  *Design radius, entry/exit angles, and depths of cover must meet Mears' requirements.*"  (Id. at ¶ 6(o) (emphasis added).)  The Court should attempt to harmonize these provisions "so as to effectuate the intention of the parties as expressed in the contract considered as a whole."  Plunkett v. Plunkett, 624 S.E.2d 39, 42 (Va. 2006).  If the Court were to accept L.A. Pipeline's interpretation of Paragraph 6(o), it would directly undermine Paragraph 6(c).  Such an interpretation seems untenable.  Mears's explanation better reconciles the apparent tension between the provisions:  "What Paragraph 6(o) refers to is the practical reality that the drill path must take into consideration that the drill path cannot require the impossible, *i.e.* that steel pipes bend at ninety degree angles."  (Pl.'s Reply Supp. Pl.'s Mot. Summ. J. 11 n.6.).

Therefore, the Court must reject L.A. Pipeline's claim that Mears assumed responsibility for the drill path based on Paragraph 6(o) to imply negligence as a means to avoid the Work Abandonment Clause.  Moreover, nothing on the record suggests, beyond mere speculation, that Mears performed HDD negligently.

In sum:  (1) an objectively reasonable interpretation of Paragraph 6(p)'s clear and unambiguous language suggests that the parties intended to utilize "ground conditions" and "subsurface conditions" interchangeably; (2) the Work Abandonment Clause of Paragraph 6(p) entitles Mears to compensation as described therein, if "ground conditions" resulted in abandonment of the Work; (3) the collapse of the River Swift creek bed is a subsurface

18

condition;[17] (4) ground conditions, specifically the collapse of the River Swift creek bed, resulted in the decision to abandon the Work; and (5) L.A. Pipeline cannot avoid the Work Abandonment Clause based on speculation about the manner in which Mears performed HDD.

Thus, the Work Abandonment Clause mandates Mears's compensation according to the terms contained therein.  Mears is due summary judgment as to L.A. Pipeline's liability.

3.      Damages:  Compensation Due under the Work Abandonment Clause

Looking at the plain language of the Work Abandonment Clause, Mears is "entitled to reimbursement for all work undertaken prior to abandonment (including all costs related to mobilization and demobilization of plant, equipment, and personnel to and from the site)."

L.A. Pipeline maintains that even if the Work Abandonment Clause applies based on the undisputed material facts, Mears is not entitled to the "[f]ull [r]elief that it [s]eeks." (Def.'s Resp. Opp. Pl.'s Mot. Summ. J. 11.).  According to L.A. Pipeline, the Court must focus on the term "reimburse" as used in the relevant Subcontract clause.  Reimbursing means "[t]o pay back, to make restoration, [or] to repay that expended."  Black's Law Dictionary 1157 (5th ed. 1979).  Because "[n]owhere in its pleadings or submitted materials does Mears set forth its actual cost of labor" and instead utilizes the "extra work" rates, L.A. Pipeline avers that summary judgment as to damages would be inappropriate.  This

_____

[17] Even if the Court were to agree with L.A. Pipeline's more restrictive interpretation of the Work Abandonment Clause—that is, "differing subsurface conditions" must result in abandonment before the clause is triggered and Mears is due compensation (see supra note 12)—the collapse of the creek bed surely differs from the subsurface conditions assumed at the beginning of Paragraph 6(p).

argument largely relies on Defendant's interpretation of the Subcontract.  (See, e.g., Def.'s Resp. Opp. Pl.'s Mot. Summ. J. 11 ("Because it is only entitled to recovery of direct costs, Mears is precluded from recovery for the $1,818,000.00 that it claimed for its labor."); Def.'s Counter Material Facts ¶ 2(o) ("The terms of the Subcontract do not allow Mears to collect payment for an abandoned drill unless the drill is abandoned *because of subsurface conditions*.  If so, they are then entitled to 'reimbursement' not the extra work rate or a 15% markup on materials, subcontractors, and rentals.").)

As Mears notes, L.A. Pipeline agrees that the invoice accurately reflects the hours charged.  (See Def.'s Counter Material Facts ¶ 2(q).)  As a result, there appears to be no dispute of material fact as to the number of hours Mears worked on its portion of the Pipeline Project.  However, there remains a dispute as to Mears's actual costs—the measure of reimbursement it is due.  Therefore, the Court will allow the parties the opportunity to present further argument on the issue of damages.  The sole issue to be addressed on the date originally scheduled for the trial of this matter is the calculation of the total actual costs Mears incurred prior to Columbia's decision to abandon HDD.

## B.  MEARS'S MOTION TO COMPEL

In its Motion to Compel Plaintiff has asked this Court to compel Defendant L.A. Pipeline to produce the L.A. Pipeline–Columbia Settlement Agreement ("Agreement") for an in camera review by the Court and, subsequently, for inspection and copying by Plaintiff.  To support its Motion, Mears states:  (1) L.A. Pipeline relies on a confidentiality provision but fails to produce the text of the agreement, (2) the Agreement likely has information that is relevant to its claim against L.A. Pipeline or that likely will lead to

admissible evidence relevant to its claim against L.A. Pipeline, and (3) any amount paid to

L.A. Pipeline from Columbia represents funds "presumably . . . to compensate damages

incurred by Mears or amounts that L.A. Pipeline owes to Mears."  (Pl.'s Mem. Supp. Mot.

Compel 4-5.)

L.A. Pipeline did not object to the Court's <u>in camera</u> review and, in fact, submitted a

copy of the Agreement at the summary judgment hearing.  Defendant, however, does

object to allowing Mears access to the Agreement because:  (1) the confidentiality provision

precludes it from disclosing the terms of the Agreement aside from certain limited

circumstances—such as revealing the settlement amount paid from Columbia to L.A.

Pipeline to a mediator; and (2) the Agreement is irrelevant and, further, could not lead to

admissible evidence since the discovery period has now closed.

As stated from the bench, Mears's Motion to Compel was granted only to the extent

necessary to allow the Court to conduct an <u>in camera</u> review of the Agreement.  The Court

has conducted its review and has determined that the document contains nothing relevant

to the sole issue remaining in this matter:  the amount of damages owed Mears by L.A.

Pipeline pursuant to the Subcontract.  As a result, the Court will deny the remainder of the

Motion to Compel.  Defendant need not produce the Agreement for Mears's inspection or

copying.

IV.  <u>CONCLUSION</u>

For the foregoing reasons, the Court will DENY L.A. Pipeline's Motion for Summary

Judgment in its entirety; will GRANT Mears's Motion for Summary Judgment as to L.A.

Pipeline's liability for damages pursuant to the terms of the Subcontract; GRANTED the

Motion to Compel only to the extent needed for the Court to conduct its review of the

Agreement; and will DENY the Motion to Compel as to Mears's request to inspect and copy

the Agreement.

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

It is SO ORDERED.

_____/s/_____
James R. Spencer
Chief United States District Judge

ENTERED this ___7th___ day of January 2009